Good morning, may it please the Corps, my name is Mark Byrne, I represent the U.S. Army with the appellant Roman Dunnigan. I reserve one minute for rebuttal. This appeal encapsulates three fundamental errors rendered by the district court. There is derivative evidence that was obtained during a traffic stop in the city of Houston in Texas which was in clear in opposition to the Fourth Amendment and therefore must be suppressed. In addition, the venue that the government chose was in fact improper. This matter should not have been brought in the Western District of New York, it should have been brought in the Southern District of Texas. Lastly, the appellant's right to a speedy trial was violated based on government's delay, it was compounded by the district court. This matter originated with regards to an interaction in Buffalo, New York. There was an investigation that took place in the city of Houston. There was a vehicle in traffic stop in the city of Houston. A drug dog was utilized in order to search the confines of the vehicle and arrest was occurred in the city of Houston. With regards to this particular traffic stop, there is no doubt that the traffic stop was a subterfuge and there's no doubt that the Supreme Court has said that's okay, so long as then there isn't a violation of vehicle protection and that what happened afterwards is okay. The Supreme Court has told us that a dog outside is not a search, even with an open door. So the only question on that is whether we believe your client who says they pushed the dog in or we believe the policeman who says they did it from outside and the district court believed a policeman. So what's the issue of that? I mean the other issues are more interesting, but I don't, you know, I might well think that that's a little terrible law, but it's the law we got. So with regards to that, Judge, it's not so much with regards to whether or not the door was actually open at that period of time, so much as the inconsistent testimony given by Officer Fisher with regards to what transpired after the initial contact with the vehicle. So Officer Fisher testified that he, in his initial testimony, because there's two suppression hearings, his initial testimony indicated that we brought the dog back to search the vehicle after there was no alerts given at that period of time. So brought is a particular word that he chose. You think they waited too long to bring the dog? I believe it was facilitated by the officer by way of command. He acknowledges that in the second suppression hearing. He gave a command after the dog extricated himself from the confines of the vehicle, left, departed, made a command, and the dog went back to begin the search again. Why is that unconstitutional? Well because, Judge, it does show that it's not the dog that's performed the search on its own volition. It's actually, in fact, we go beyond that step and it's now encouraged or facilitated at that period of time. I'm just, so you're saying that the fact that the dog had gone around the car twice and then had been distracted by a tree meant that the handler was, just couldn't call him back to the car? Or am I misunderstanding your point? Well there was no alerts, well actually going back to the inconsistent testimony, he initially testified there was no alerts. I believe in his direct examination in the second suppression hearing, he indicates that two alerts were given at two different periods of time. So obviously his testimony is inconsistent. However, yes, since no alerts were given by the narcotics dog, it departed and it was only after Officer Fisher indicated that he gave a command in order to research the vehicle. I believe that's a point of issue in this matter. Okay. Why was this not meet the speedy trial act at least, given that there were all these motions in between and that after all some part of the decision and the delay, now motions were dealt with very slowly, but much of what was going on was also your client's actions. Well Judge, with regards to the speedy trial claim, this matter between the indictment and then the trial, it was a period of three years, which is presumptively unreasonable on its face. Certainly my position is that the delay predominantly was the government's doing because they contested the improper venue that was a point of litigation and then the court essentially compounded the area by denying it and sat on that motion for a period of time. There's also certain excludable time under the speedy trial act where I believe it was 142 days where there was no stipulation between the parties with regards to that exclusion. In addition, there was no colloquy with regards to any interest of justice determination. There was no statement about interest of justice. Case would be much easier if there had been. So the question is, were these excludable because of the motions, because of the venue which you brought up and which the court took a long time to decide, but under a Supreme Court, if there's a motion there, that time is excludable, isn't it? Yes, Judge, for a reasonable delay, of course. So I believe that just based on the pendency of this case and how long it actually has taken is presumptively unreasonable given the length of time. But there was at least a motion to reopen the suppression hearing. There was. The appellant changed counsel. He wanted to explore with regards to this particular narcotics dog search. Obviously the district court granted that that motion. In addition, Mr. Donegan also had a motion in order to consider with regards to that initial motion to reopen and the court didn't have any clarity for that for a significant period of time. With regards to venue, as I previously indicated, this was, excuse me, brought in the Western District of New York. The factors, the enumerated factors considered in Platt versus Minnesota Mineral and Manufacturing indicate that it would weigh more heavily to be tried in the Southern District of Texas. This is where the investigation transpired. It's where the arrest occurred. Majority of the witnesses were down in the Southern District of Texas. That's presumably where majority of the documents are. But are you saying there is no venue in New York where it was tried or are you saying as a matter of discretion it might have been wise for the court to send it to Texas? Because the two things are really very different. If there is no venue, then that's it. If it's discretion, it gets very hard in the Court of Appeals. So under Rule 21 of the Federal Rules of Criminal Procedure, this matter should have been brought, if any, in the Southern District of Texas based on factors that are considered by the Supreme Court. So with that, as I previously indicated, there's only a very select few that would weigh in favor of the government to keep the matter in the Western District of New York. The rest of the factors that were enumerated are essentially neutral. With regard to, excuse me, time, Mr. Dunnigan did, like I indicated before, file a motion in order to expedite because of the prejudice that was sustained by him by sitting while incarcerated two out of those three years prior to trial. He did it on behalf of his, his attorney did it on behalf of him. He wanted to progress this case as much as he could. Obviously it was no prejudice to the government or the court. The court unfortunately sat on that motion without giving any sort of clarity as to what direction they're going to go in with regards to whether or not they're going to reopen the matter for suppression or, and I believe he advised too, that he wanted to be released on this. How soon did your client raise the question of speedy trial in terms of saying to the court, you have these motions and we know, you know, that that could be excusable, but you're getting into trouble with these and therefore deal with them. I'm sorry, I don't have the exact date when that was filed. Oh, I'm sorry. He filed a motion in October 2018, so it would approximately be, the indictment occurred in June 2017, so a year. He filed that motion. Thank you. Good morning, your honors. May it please the court, Sean Eldridge for the United States. The district court's judgment should be affirmed. I'll take the, unless the panel would like me to go elsewhere, I'm happy to address the issues in the order my friend did. In terms of the suppression issue, Judge Calabresi, you said the choice was essentially between believing what Mr. Dunnigan says that they pushed the dog in. Respectfully, that's not correct. Mr. Dunnigan didn't say that. Mr. Dunnigan's claim was essentially that Officer Fisher, the officer who was the dog handler, directed the dog to leap into. Yeah. And that is, there's absolutely no testimony to that in the record. Officer Fisher several times said that's not what happened. Judge Arcara found to the contrary, and certainly there was some, I will say, imprecise terms that were used in the hearings. I mean, Judge Arcara brings that up himself. You can see at, you know, 512 to 514 and 516 to 519 of the record, you know, Judge Arcara jumps in and asks some questions himself to basically say, hold on, we're using different terms. What's an alert? What's an indication? I don't understand. Walk me through this because this is a really critical point. And that's what Officer Fisher did, and then Judge Arcara made his credibility determination, which is not clearly erroneous. In terms of the speedy trial claim, is it really part of an ordinary traffic stop to do the degree of getting a dog, having the dog look, come back and have the dog do more? Can we say that that is part of a reasonable set of questioning after a stop for driving too fast or having no lights or something of that sort? Isn't that stretching? So that's not, respectfully, Judge, that's not the issue on this appeal. What your Honor is talking about is the Supreme Court's decision on Rodriguez, and I would agree that absent reasonable suspicion, the officers cannot extend a traffic stop beyond the time that it takes to complete the ordinary traffic duties. However, as the District Court found, and which is not challenged on this appeal, that there was reasonable suspicion then based on the conflicting answers, the lies that were being told to the officers to bring the dog. And your Honor's, you know, you can watch the video yourself. The part that's there, you see Officer Fisher approach, do kind of the first lap around the car, and then you can see the dog, Lola. She starts to walk to a tree that's probably no closer than for me to Judge Hand's statute here. And Officer Fisher then testifies that, you know, he says what she was doing was called bracketing. They follow the smell to where it goes, kind of parallel to where the open door was. And ultimately, he says, when she got towards the tree, he says, I thought maybe she was actually gonna use the bathroom. And he had said, my opinion was that she's not done with her search. I said sook, which was the command he uses to say search. She came back to the dog, or excuse me, to the car, made another lap. She walked past the door first, and then went back to it and jumped it. I'm sure Judge Leonard Hand appreciates you're not leaving the dog. I'm certainly not comparing Judge Hand to the dog. I appreciate that. Thank you, Judge. In repeatedly bringing the dog back to an open door, let's walk by it again. I mean, what should, and we haven't really said anything about this particular subject. So what should be the articulation of a Fourth Amendment rule that would apply in this context? Just it's really not a matter that was addressed below. I mean, the only issue that was raised, essentially, was that the officer directed the dog to leap into the open car. And that's what made the search unreasonable. What is in the record here is the video that shows the first part of the search. Like I said, we don't have the video because the body camera turns away. It wasn't on Officer Fisher. It was one on one of them. So what you're saying is, well, that might be an issue in some case. In this case, the question of that is not really before us. Correct, Your Honor. In a future case, there probably has to be some outward limit. I will say you can see in the video and just from reading Officer Fisher's testimony of how the search took place, it was pretty quick. I think the first lap around the car takes, I'm estimating from my memory, maybe 20 seconds. The dog walks to the tree and he says he commands her right back over. And within, I would assume, no more than 20 seconds, he says he does another lap as she's in the car and alerting there or indicating maybe is the better term. I hate to draw you away from the dog, but what's the evidence that supports evidence beyond a reasonable doubt that supports an inference that Dunnigan used this particular stash house? Sure, Judge. So I think there's... Respectfully, I totally disagree with you. I mean, I think some of the more key points as to what connects Dunnigan to the stash house, some of them are basic. I mean, there's information from buying those plane tickets that says they were purchased by Roman Dunnigan at 1807 Elmwood Avenue, the address. Now, true, it doesn't say the apartment number, but that's number one. There doesn't seem to be any dispute about that. The real dispute was, you know, essentially, I don't have this apartment, I had this other apartment, and that's what one of Mr. Dunnigan's witnesses testified to. But then inside that apartment, we have a receipt in Mr. Dunnigan's name. We have... I'm sorry? From Macy's? I believe that's what it was from, yes. Not something that, you know, an ordinary person would have. You have the firearm with a DNA, a mixture on it, but as the analyst testified, a trial that is something like 10,500 times more likely to have come from him than a random person. You have those exact same intake boxes, the inflatable chair that was in the car in Texas that contained the kilogram of cocaine. It's an inflatable chair, but it was not inflated. That's right, Judge. The one in Texas, I mean, it says on the outside of the box in pretty big print, you know, pump not included. But, of course, they didn't buy a pump because it wasn't for the purpose of having a chair. But then back in the apartment in Buffalo, we have those two of those exact same boxes. So in terms of that, there's the cell phone evidence, too, which, you know, has the nicknames of Bones and Booney or Bonnie, which was an issue that was contested at trial. But there is certainly more than enough evidence for the jury to draw those reasonable inferences. Our cases on whether somebody who was there was part of a conspiracy or not are kind of messy. We do have a case in which I changed my mind about people having pizza together and that that was ultimately found to be enough because there was a gun in the room. But there are cases that go the other way. Aren't we kind of messy about what is enough evidence so that a jury can find somebody be part of a conspiracy? Judge, I think this court has articulated the standard pretty well in conspiracy cases in saying, you know, because of the secretive nature of conspiracy, that they are essentially a different breed. And we give great respect to the jury's findings there because of how they operate in secret. I mean, there are some cases that go the other way. But I think the facts are very different. I mean, Judge Jacob's opinion in the Jones case, you know, from I think it was 2005 or so, is a completely different fact pattern where there you have two people who just happen to be coming out of the apartment, I think walking their dog, while some drugs have been thrown out of the apartment. And that was it. That was the extent of the evidence to connect them to that apartment. Where here we have a completely different situation. I mean, we have the incident at the airport, you know, where the four of them are together. Mr. Dunnigan leaves and Mr. Lloyd tells the DEA agent, you know, I want to tell you what's going on here. You know, and they agree to talk later. I think there's a very fair inference there that it was not to say, you know, hey, we're going to a party. I mean, I'm not going to tell you now. Then coupled with the cash, the unexplained income, the lies, the incident in Texas, the stuff in the stash house back in Buffalo. So I think given the secretive nature of conspiracy, given the fact that the jury is allowed to draw these reasonable inferences, not just from one of these things, but as the district court said, taking one of these things in isolation, fair argument to say, you know, that one of those things would not be sufficient. But putting all of these together over that time period is a completely different story. It is more than sufficient for the jury to make that conclusion. Now, I do have some questions about the speedy trial. Not so much the act, because the act, I think, there were things that were excusable. But if we look at the constitutional notion and the presumption, which there is because of the time, wasn't this a case where, after all, the court really fudged it by taking too much time on one thing or another, and that this really was not a speedy trial? Now, there was no specific evidence of prejudice, but I think one can assume prejudice. Well, I disagree, Judge, and I think this court's cases say we don't assume prejudice. I mean, the time period can be presumptively prejudicial to get over the first Barker factor, but this court's cases are very specific. I think Judge Jacob's opinion in Moreno talks about that with prejudice in saying that there has to be a much more specific showing to say this is what the actual prejudice is, and there isn't. But let me tackle the timing part head on, and let me talk both about the constitutional matter and the act itself. Under the act, I think as Your Honors have already pointed out, under subsection H1D, the time is automatically excluded. And I heard my friend say that his view is that that time period wasn't reasonable. The Supreme Court says that doesn't matter. Your Honor said before sometimes we don't like decisions from superior courts that we might not agree with, but that's the law. I mean, the Supreme Court very clearly in Henderson says that if that time period is being consumed by the pendency of the motion, it is automatically excluded regardless of the reasonableness of the delay. And if I recall correctly, I think Justice White even bemoaned that in his dissent, saying something like if the judge just wants to kick it off and basically go play golf and schedule the hearing for later, tough. And the Supreme Court says that that is OK. Now, I'm not suggesting that's what happened in this case, but that is the holding of Henderson. In the constitutional matter, though, Judge, I think the more important thing to keep in mind here is this trial went to, this case went to trial in August of 2020, but it was set for trial, set for trial on October 16th, 2018, almost two years earlier. There's only one reason that it didn't go that, and that is Roman Dunnigan. Mr. Dunnigan changed lawyers. He changed lawyers again. At first, the case, when Mr. Dunnigan got his second lawyer, it was pushed back, I think, to February of 2019. His new counsel said he couldn't be ready for that. He then came in and filed a whole new series of motions, which then resulted in these additional suppression hearings, which had already been litigated and closed. And Mr. Dunnigan, as I recall, didn't raise, didn't bring any type of a speedy trial motion until April 28th of 2020, just a few months before trial and right around the time that the trial was actually then being scheduled. And even before that, the government had opposed further adjournments of the case and said, we are ready. We have been ready for two years. And the only reason this hasn't gone to trial is because Mr. Dunnigan keeps getting new lawyers and Mr. Dunnigan keeps filing new motions. And that's what happened here. Thank you. Thank you. I'm over unless the court has any further questions. Thanks very much. I'll be very brief. With regards to the underlying conspiracy, there's not a scintilla of evidence that Mr. Dunnigan had any knowledge with regards to currency being at the airport, with regards to his co-defendant or his traveling companions at that period of time. Mr. Dunnigan was never seen at the airport. Mr. Dunnigan was never interviewed at the airport. With regards to the connection, Judge, you brought up with regards to the Elmwood and the relevant conduct to the Elmwood raid. Mr. Dunnigan acknowledged that, yes, he did have an apartment on that same floor. I believe it was 109. The search occurred in 104. Yes, there is a receipt that was by Mr. Dunnigan at the apartment. However, the utilities, anything with regards to that particular apartment at 104 was not in Mr. Dunnigan's name. It's an easily explainable circumstance that DNA or receipt could possibly be in an apartment. That's right down the hall from Mr. Dunnigan's apartment, which he acknowledged. Yeah, but then can't the jury assume that he used that apartment sufficiently? No, it wasn't his apartment, but that he used it sufficiently so that the stuff found there could be attributed to him as a conspiracy? Well, Judge, certainly Mr. Dunnigan was never, there was no acknowledgement that law enforcement knew anything about Mr. Dunnigan at that period of time. And they never inquired as to the apartment owner at that period of time. So we don't really know with regards to the connection between an individual by the name of David Thomas or my client. Thank you. Could you just address on the speedy trial issue, your adversary said that your client first asserted his right in April 2020. And I think you said in your... Yeah, I misspoke, Judge. It is April 2020. That was with regards to the venue motion was the one that I previously referenced. Thank you. Thank you very much. Thank you both and we'll take the matter under advisement.